**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

THOMAS DANIEL BOVENSIEP,

                       Petitioner,

v.

DEAN BORDERS, Warden,

                       Respondent.

Case No.:  17cv0074-GPC (NLS)

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      Thomas Daniel Bovensiep is a state prisoner proceeding pro se with a First Amended Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 10.)  He challenges his San Diego County Superior Court convictions for thirteen counts of grand theft and two counts of securities fraud, for which he was sentenced to nine years and four months in state prison.  (Id. at 1-2.)  He claims here, as he did in state court, that his federal constitutional rights to due process, fundamental fairness, and a speedy trial were violated by the pre-charging (claim one) and post-charging delays (claim two) in his prosecution.  (Id. at 6-7, attach. # 1 at 1-6; see ECF No. 18 at 4 (finding remaining claims abandoned).)

      Respondent has filed an Answer (ECF No. 19), and has lodged portions of the state court record (ECF Nos. 15, 20).  Respondent contends federal habeas relief is unavailable because the state court adjudication of Petitioner's claims is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceedings. (Answer at 2; Memo. of P&A in Supp. of Answer ["Ans. Mem."] at 5-17.)

Petitioner has filed a Traverse. (ECF No. 23.) He contends the state appellate court erred in finding that the only delay which was not attributable to him was brief and non-prejudicial, and that he would not have been found guilty but for the destruction of evidence caused by delays attributable to the prosecution. (Id. at 1-12.)

As set forth below, the Court finds the state court adjudication of Petitioner's claims is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts. Even if Petitioner could satisfy that standard, he has not alleged facts which, if true, demonstrate a violation of his federal constitutional rights. The Court recommends the Petition be denied.

## I.  PROCEDURAL BACKGROUND

In a 27-count Amended Complaint filed in the San Diego County Superior Court on December 9, 2013, Petitioner was charged with eighteen counts of grand theft in violation of California Penal Code § 487(a), three counts of misrepresentation in the sale of securities in violation of California Corporations Code §§ 25401 and 25440, and six counts of filing a false tax return in violation of California Revenue and Taxation Code § 19705(a)(1). (Lodgment No. 5, Clerk's Transcript ["CT"] at 9-21.) The Amended Complaint alleged as sentence enhancements that the amount stolen exceeded $65,000 within the meaning of Penal Code § 12022.6(a)(1) with respect to six of the grand theft counts, and exceeded $100,000 within the meaning of Penal Code § 186.11(a)&(b), and $150,000 within the meaning of Penal Code § 12022.6(a)(2), as to one of the grand theft counts. (Id.)

On March 17, 2015, a jury found Petitioner guilty of fourteen counts of grand theft and one count of fraudulent sale of securities, not guilty on the remaining counts, and made true findings on three sentence enhancement allegations. (CT 507-34.) On May 29, 2015, he was sentenced to nine years and four months in state prison. (CT 732-34, 843-46.)

Petitioner appealed, raising the same claims presented here. (Lodgment No. 1.) The appellate court affirmed in all respects. (Lodgment No. 2, People v. Bovensiep, No.

D068198, slip op. (Cal.App.Ct. Aug. 22, 2016).)  On September 21, 2016, he filed a petition for review in the California Supreme Court presenting the same claims, which was summarily denied on October 26, 2016.  (Lodgment Nos. 3-4.)

## II.  UNDERLYING FACTS

The following statement of facts is taken from the appellate court opinion on direct appeal.  This Court gives deference to state court findings of fact and presumes them to be correct.  Sumner v. Mata, 449 U.S. 539, 545-47 (1981).

> Because the parties are familiar with the facts, we summarize only the general facts concerning the underlying crimes at issue in this appeal.  We present additional facts concerning the speedy trial and statute of limitation issues in our discussion below.

### Ronald Dixon—Count 1

> In 2003, Bovensiep persuaded his pastor, Craig Knudsen, and Steven Zoumaras, a business acquaintance, to purchase shares in a limited liability company (LLC) for the purpose of purchasing a condominium located in Hawaii (the 835 property).  Unbeknownst to the partners, Bovensiep listed his brother-in-law, John Oakes, as the owner telling Oakes that he wanted to use Oakes's good credit.  Bovensiep told Oakes, who was not in on the scheme, that he would put the loan in the LLC's name, removing Oakes, as soon as Bovensiep refinanced the property.  Bovensiep secretly refinanced the 835 property and took out a line of credit of over $114,000, but left Oakes listed as the owner of the property.

> Dixon, who had met Bovensiep through Oakes and his church, bought Zoumaras's interest in the 835 property for a total of $117,578 in June 2005.  On Thanksgiving Day 2009, Dixon learned that the 835 property was being foreclosed.

### The Kneeshaws—Count 7

> George Kneeshaw and his wife, Terry, have known Bovensiep for over 35 years.  George and Bovensiep had worked as deputy sheriffs together and they remained friends.  In September 2007, the Kneeshaws, along with other individuals each invested about $60,000 toward the purchase of a condominium in Kihei, Maui (the Kihei property).  Bovensiep managed the Kihei property.  On December 5, 2009, the Kneeshaws learned that the Kihei

property was facing foreclosure. At the end of December 2009, George reported the matter to the sheriff's department for a potential criminal investigation.

## The Kneeshaws—Counts 5, 8–11

Bovensiep convinced the Kneeshaws to make a series of four separate loan investments, supposedly to people in need. The Kneeshaws were to receive monthly interest and a return of their principal after a specified time. Bovensiep made some interest payments, but never repaid the principal. Bovensiep later admitted to Trudianne Bullard, an investigator for the district attorney's office (DA), that he used the money himself to keep his scheme afloat.

## Frederick Semeit—Count 12

Semeit, the Kneeshaws' son-in-law, believed he could trust Bovensiep as Bovensiep seemed like a really nice guy. Semeit purchased two homes using Bovensiep's services and also obtained a $5000 loan from Bovensiep, which Semeit repaid. After Semeit divorced, he gave Bovensiep a $10,000 down payment in February 2008 for a house. When the purchase allegedly fell through, Semeit gave Bovensiep another $15,000 and let Bovensiep keep his initial $10,000 with the understanding that Bovensiep would pay Semeit interest on the money and the debt would mature in November 2008. Semeit gave Bovensiep another $20,000, with a maturity date in October 2008. Semeit believed Bovensiep would be loaning the funds to a third party. Bovensiep never repaid Semeit.

## Chris Miller—Count 13

In April 2008, Miller, a church friend of Bovensiep, gave Bovensiep a $48,000 down payment to purchase a condominium for Bovensiep to manage. Bovensiep eventually told Miller that escrow on the property had been cancelled and he would give Miller his money back. Bovensiep never paid Miller back. Bovensiep admitted to Bullard that when he got money from Miller, he used it to pay someone else who had loaned him money and "lied" to Miller about where Miller's money was going.

## Robert Stevens—Count 18

Karen Taylor's husband had invested money with Bovensiep and spoke very highly of Bovensiep. Taylor believed Bovensiep took the money to

17cv0074-GPC (NLS)

extend loans to third parties. Taylor referred two of her sisters, Laura Colling and Marsha Allen, and her best friend Diane Mullins to Bovensiep. Allen in turn referred her friend Patricia Osborne to Bovensiep. Mullins referred Stevens, her father, to Bovensiep.

In January 2007, Stevens invested $25,000 with Bovensiep and was to receive monthly interest and return of his principal after a specified time. Bovensiep never paid Stevens back. Bovensiep later admitted to Bullard that he led Stevens and others to believe the loans were for third parties, but that he used the money to keep his other schemes afloat.

(Lodgment No. 2, <u>People v. Bovensiep</u>, No. D068198, slip op. at 2-4.)

## III. PETITIONER'S CLAIMS

(1) Petitioner alleges he was denied his "Federal Constitutional right to [a] speedy trial including where there has been a substantial and/or prejudicial delay prior to accusatory pleading," and that the delays resulted in the destruction of exculpatory evidence which violated his rights to due process and fundamental fairness under the Sixth and Fourteenth Amendments. (ECF No. 10 at 6; ECF No. 10-1 at 1-6.)

(2) Petitioner alleges he was denied his Fifth, Sixth and Fourteenth Amendment rights to due process, fundamental fairness and a speedy trial by the destruction of exculpatory evidence caused by "'unjustified' and 'negligent' delays in an already 'old case'" by the prosecution after he was charged. (ECF No. 10 at 7; ECF No. 10-1 at 1-6.)

## IV. DISCUSSION

As set forth herein, the Court finds that the state court adjudication of Petitioner's claims is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts. The Court also finds that even if he could satisfy that threshold showing, federal habeas relief is not available because he has not alleged facts which, if true, show a federal constitutional violation.

### A. Standard of Review

In order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred in order to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. In order to satisfy § 2254(d)(2), the factual findings upon which the state court's adjudication of his claims rest must be objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

## B.    Claim One (Pre-Charging Delay)

Petitioner alleges in claim one that he was denied his "Federal Constitutional right to [a] speedy trial including where there has been a substantial and/or prejudicial delay prior to accusatory pleading." (ECF No. 10 at 6.) He contends the delay resulted in the destruction of exculpatory evidence in violation of his rights to fundamental fairness and due process under the Sixth and Fourteenth Amendments. (ECF No. 10-1 at 1-6.)

Respondent answers that the state court correctly found that a federal constitutional right to a speedy trial is not implicated by pre-charging delay, but such a claim is properly analyzed as a due process claim, and the state court determination there was no due process violation arising from pre-charging delays is consistent with clearly established federal law and is not based on an unreasonable determination of the facts. (Ans. Mem. at 6-12.)

Petitioner replies that the prosecution's investigator spent only 65 days investigating his case during a period of more than three years prior to bringing charges, that the trial court found a six-month delay in assigning an investigator to be "unjustified" and the result of "prosecution neglect," yet the appellate court erroneously denied this claim on the basis that even if the six-month delay caused destruction of evidence it did not prejudice the defense because the destroyed evidence was not exculpatory. (Memo. of P&A in Supp. of Traverse at 2-5.) He argues that the appellate court's findings that the delay was short and did not violate federal due process involves an unreasonable determination of the facts regarding the length of the delay and whether it caused the destruction of the evidence, and involves an unreasonable application of clearly established federal law which provides that any excessive delay before an arrest or the filing of an accusatory pleading violates federal due process because it is impossible to determine who is prejudiced from the delay. (Id.)

As set forth below, a criminal complaint was first filed with the San Diego Sheriff's Department on December 30, 2009, which was referred to the District Attorney's office in February or April 2010, and an investigator was assigned in October 2010. Petitioner was arrested on January 29, 2013, after a two-year, three-month investigation, and was charged on February 13, 2013. The prosecution's position at trial was that the criminal nature of the offenses was first discovered by the victims on December 9, 2009, when Petitioner admitted to them he had used their money for personal reasons, and the issue of discovery as it related to the four-year statute of limitations was presented to the jury.

Petitioner claimed in the state appellate and supreme courts, as he does here, that (1) the victims knew or should have known prior to February 2009 of the criminal nature of the offenses, which involved transactions primarily occurring in 2006-08, and therefore the prosecution, which began in February 2013, was barred by the four-year statute of limitations, and (2) the delay in bringing charges was attributable to: (a) the failure of the victims to timely notify law enforcement, (b) the ten-month delay from when the criminal complaint was filed until the District Attorney appointed an investigator, and (c) an additional three to four-month delay in requesting search warrants, all of which resulted in

the unavailability of bank documents which are routinely destroyed every seven years, as well as documents kept in a storage locker by Petitioner which were destroyed as a result of his inability to pay the storage fee as a result of the loss of his job upon his arrest. (See Lodgment Nos. 1, 3.) The claim was summarily denied by the state supreme court, and the appellate court denied it on the merits. (Lodgment Nos. 2, 4.)

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991). The Court will look through the silent denial by the California Supreme Court to the last reasoned state court decision addressing this claim, the appellate court opinion on direct appeal, which stated:

> Bovensiep complains about prosecutorial delay in charging him. Delay in charging a defendant after commission of an alleged crime (pre-charging delay) does not implicate speedy trial rights. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).) The federal right to a speedy trial attaches only after an arrest or the filing of an indictment or information, although California extends the right by holding that it attaches after a complaint has been filed. (*United States v. Marion* (1971) 404 U.S. 307, 320; *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1327.)
>
> Here, Bovensiep sought to dismiss the charges against him based on alleged delays in charging him. Bovensiep never sought a dismissal based on post-charging delay. Notably, the record shows that after charges were filed, Bovensiep requested numerous continuances of the preliminary hearing and three trial continuances. Under these facts, Bovensiep waived his right to a speedy trial. (*People v. Wilson* (1963) 60 Cal.2d 139, 146 (the constitutional or statutory right to a speedy trial may be waived if not asserted prior to commencement of trial).) Accordingly, we focus on Bovensiep's claim of pre-charging delay.
>
> A. Additional Background
>
> Before trial, Bovensiep sought to dismiss the case based on violation of his rights to due process and speedy trial, claiming the delay resulted in the loss of bank documents destroyed in the normal course of business and the loss of all records he kept in a storage facility. The trial court deferred consideration of the motion until after trial, so as to better assess any resulting prejudice to Bovensiep. Following trial, Bovensiep again moved to dismiss

the action based on the alleged constitutional violations. The trial court denied the motion. The court noted that by the People's own admission, the case had "sat around" from April or May 2010 to October 2010. Nonetheless, it concluded this unjustified delay did not result in any prejudice as this delay did not cause the missing documents. The trial court found that the great age of the case was primarily attributable to how long it took the victims to discover Bovensiep's possible criminal activities and bring him to the attention of law enforcement.

## B. Legal Principles

California's due process clause states, in part, that "(p)ersons may not . . . be deprived of life, liberty, or property without due process of law." (Cal. Const., art. I, § 15.) Pre–charging delay is analyzed as a due process claim. (*Scherling v. Superior Court* (1978) 22 Cal.3d 493, 505.) "The due process clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Rather, the task of the reviewing court is to determine whether pre-charging delay violates the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency. Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." (*People v. Dunn–Gonzalez* (1996) 47 Cal.App.4th 899, 914.) "(T)o prosecute a defendant following investigative delay does not deprive the defendant of due process, even if his or her defense might have been somewhat prejudiced by the lapse of time." (*Id.* at p. 915.)

We employ a three-part test to determine if a defendant's due process right to a fair trial has been violated because of pre-charging delay: "(1) the defendant must show that he has been prejudiced by the delay, whereupon (2) the burden shifts to the People to justify the delay, and (3) the court balances the harm against the justification." (*People v. Pellegrino* (1978) 86 Cal.App.3d 776, 779.) Prejudice from pre-arrest delay is not presumed. (*Nelson*, *supra*, 43 Cal.4th at p. 1250.) To avoid criminal charges on this basis, the defendant "must affirmatively show prejudice." (*Ibid.*; *People v. Martinez* (2000) 22 Cal.4th 750, 767.)

"(W)hether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely

negligent, a greater showing of prejudice would be required to establish a due process violation." (*Nelson*, *supra*, 43 Cal.4th at p. 1256.) We review the trial court's ruling on a motion to dismiss for prejudicial pre-charging delay for abuse of discretion, deferring to any underlying factual findings supported by substantial evidence. (*People v. Cowan* (2010) 50 Cal.4th 401, 431.) Whether a defendant met the initial burden of showing prejudice is a factual question for the trial court. (*People v. Hill* (1984) 37 Cal.3d 491, 499.)

C. Analysis

Bovensiep was unable to provide records regarding his bank account prior to December 21, 2007, because these documents had been destroyed by his bank in the normal court of business. Bovensiep kept his internal financial and accounting records in a storage facility. All of these records were destroyed in September 2013 when a storage unit he had leased was seized for nonpayment. Bovensiep argued below that the bank records and the records in the storage facility would have shown he used the victim's funds in the normal course of his real estate business, and that he told some of the victims that he took their money not to lend to third parties, but to keep his businesses afloat.

The prosecution learned that Bovensiep may have committed a crime on December 30, 2009, when George Kneeshaw filed a report with the sheriff's department. It is unclear when the sheriff's department referred the matter to the DA. The prosecutor represented to the court that the DA received the case in April 2010. However, the People's opposition papers and a timeline prepared by Bullard indicate the DA received the matter in February 2010.

In May 2010, a deputy district attorney contacted George Kneeshaw about the matter. Thereafter, there was about a four-month delay until the DA referred the matter to Bullard in October 2010. The prosecutor speculated that the unavailability of an investigator caused this delay, but presented no evidence on the issue. On this basis alone, the trial court properly found this four-month delay unjustified. The trial court concluded, however, that this unjustified delay did not cause the missing documents; thus, Bovensiep was not prejudiced by the delay. Substantial evidence supports this conclusion.

Records from the storage facility show Bovensiep habitually failed to timely pay the rental fee from June 2008 until the time the storage facility notified him in March 2013 that the stored property would be sold. The documents in the storage facility went to auction in August 2013, but were not

actually destroyed until September 2013. Notes from the storage facility show that Bovensiep intentionally allowed the contents of the unit to go to auction. Bovensiep was arrested on January 29, 2013, and interviewed the following day. Accordingly, Bovensiep had adequate time to inform the prosecution of the importance of these documents before the storage facility had them destroyed. The trial court correctly found that any pre-charging delay did not result in the destruction of the storage facility documents. (*People v. Cowan*, *supra*, 50 Cal.4th at p. 432 (a suspect who, knowing of police interest, fails to preserve alibi evidence in his control, cannot complain that a delay in charging violated his due process rights).)

The parties stipulated that Bovensiep's bank retained its records for seven calendar years, that the bank destroyed the records on a rolling basis, and that the missing bank records had been destroyed in the normal course of bank business. As a result, Bovensiep was unable to provide records regarding his bank account prior to December 21, 2007. Thus, the unjustified four-month delay in getting the case assigned to an investigator resulted in the loss of a portion of the bank records.

As the trial court noted, however, records showing how Bovensiep spent the money was not the critical inquiry because "(a)t a point it becomes theft when you're taking money from someone knowing you can't pay it back." Bovensiep admitted to Bullard that he took about $55,000 from the 835 property as loans for himself or his business that he never repaid. Bovensiep also admitted taking money from certain victims telling them the funds would be used as loans to needy third parties, but that he used these funds to keep the condominiums afloat. Bovensiep stated that things started to "snowball( )" as he was borrowing from one individual to pay another. Bovensiep conceded that when the victims confronted him about the money, he lied to them with false stories because he had already spent the money to keep everything afloat.

The trial court instructed the jury on theft by false pretenses and theft by embezzlement, and told the jurors that they were not required to agree on the same theory to find Bovensiep guilty. Bovensiep's statements to Bullard supported an inference that he took some of the money (1) knowing he would not be able to repay it, supporting theft by embezzlement, or (2) based on false representations that he would be loaning the money to needy people, supporting theft by false pretense. (See CALCRIM Nos. 1804, 1806.) Accordingly, the record supports the trial court's finding that Bovensiep did not suffer actual prejudice. [Footnote: Bovensiep also contends the bank records were relevant to his defense that the investment losses suffered by the

victims were the result of the financial downturn of the economy, rather than any misappropriation he may have committed. While it is probably true that the economic downturn caused the real property investments to lose value, we fail to see how the bank records would have proven this fact.]

Finally, a prosecutor is entitled to take a reasonable amount of time to investigate an offense to determine whether prosecution is warranted or to gather more evidence to build a case against the defendant. (*People v. Dunn–Gonzalez*, *supra*, 47 Cal.App.4th at p. 911.) "(T)o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." (*United States v. Lovasco* (1977) 431 U.S. 783, 796.)

Here, Bullard prepared a detailed timeline showing an active investigation of the matter. After Bullard received the matter she immediately started interviewing witnesses and securing documents. In 2010, Bullard asked for assistance from Steven Papet, an investigative auditor with the California Department of Justice, because she knew the matter was going to be "document heavy." In July 2011, Bullard e-mailed Papet that the DA was ready to file as soon as he finished his analysis. However, the investigation then led to the discovery of additional victims. In June 2012, Bullard learned that Collings and Taylor might be victims. Through that interview Bullard learned about Stevens and Allen and interviewed them in July 2012. Thus, the DA was discovering additional victims six months before it filed charges against Bovensiep.

The evidence supports the trial court's conclusion that once the DA assigned the matter to Bullard, the time required to investigate justified any delay in charging Bovensiep. Even assuming the loss of bank records during the investigation of the case prejudiced Bovensiep, the justifiable investigative delay outweighed Bovensiep's showing of prejudice. Thus, we conclude the trial court did not abuse its discretion in refusing to dismiss the charges against Bovensiep based on pre-charging delay.

(Lodgment No. 2, <u>People v. Bovensiep</u>, No. D068198, slip op. at 5-11.)

The state appellate court correctly found that Petitioner's Sixth Amendment speedy trial right does not attach prior to the filing of an accusatory pleading or arrest. <u>United States v. Marion</u>, 404 U.S. 307, 320 (1971) ("[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal

charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.")  The appellate court correctly addressed Petitioner's allegation of pre-charging delay as a Fifth Amendment due process claim.  Id. at 324 ("[T]he Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused."); see also Ingraham v. Wright, 430 U.S. 651, 673 (1977) (noting that the Due Process Clause of the Fifth Amendment is applicable to the states through the Fourteenth Amendment).

Clearly established federal law provides that in order for Petitioner to demonstrate a violation of his Fifth Amendment right to due process based on pre-charging delay, he must carry a heavy burden to prove actual, non-speculative prejudice to his defense from the delay.  United States v. Huntley, 976 F.2d 1287, 1290 (9th Cir. 1992), citing United States v. Lovasco, 431 U.S. 783, 790 (1977).  As the state court correctly noted, if Petitioner demonstrates actual prejudice, the Court must balance the length of the delay against the government's reason for the delay to determine whether it "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' which define 'the community's sense of fair play and decency.'"  Lovasco, 431 U.S. at 790 (citations omitted); Huntley, 976 F.3d at 1290.

The state appellate court rejected this claim on the basis that the pre-charging delay was not excessive, that the loss of the records in the storage unit was entirely Petitioner's fault, and that even assuming the loss of records during the investigation was prejudicial, "the justifiable investigative delay outweighed Bovensiep's showing of prejudice" because he merely contended the records would have showed he spent the victims' money in the course of his business, which would not have helped his defense against allegations that he never intended to pay the money back and knew he could not do so.  (Lodgment No. 2, People v. Bovensiep, No. D068198, slip op. at 5-11.)  That approach is consistent with clearly established federal law.  See Lovasco, 431 U.S. at 790 ("[P]roof of prejudice is

generally a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.")  For the following reasons, the state appellate court's application of that clearly established law, and its factual determinations, are objectively reasonable.

Accordingly to the timeline prepared by prosecution investigator Bullard, Kneeshaw filed a criminal complaint with the San Diego Sheriff's Department on December 30, 2009, which was referred to the District Attorney's office on February 1, 2010, and Bullard was assigned on October 1, 2010.  (CT 603.)  Petitioner was arrested on January 29, 2013 (CT 605), and the first charging document was filed on February 13, 2013.  (RT 2777.)  He was arraigned on February 15, 2013, and released on bail within ten days.  (CT 736-38.)  The prosecutor argued that the first time the victims learned he was engaged in criminal conduct was on December 9, 2009, when he admitted to the victims during a meeting that he had used their money for his own personal purposes.  A recording of that meeting was played for the jury, and a transcript is in the record.  (CT 371-435.)

Petitioner argued in a pre-trial motion that Dixon noticed the first sign of problems when he found out in late 2006 or early 2007 "that unit 835 had foreclosure tape on the door."  (CT 78.)  He argued that the foreclosure should have "made them suspicious of potential criminal conduct," and that they should have "investigated and reported the potential criminal conduct to law enforcement," but did not do so until they filed a criminal complaint on December 30, 2009.  (Id.)  He contended that investigator Bullard was not appointed until ten months later, in October 2010, and Bullard waited an additional three to four months before requesting search warrants and did not interview Petitioner until December 2012.  (CT 180-81.)  As quoted above, the appellate court stated:

> After Bullard received the matter she immediately started interviewing witnesses and securing documents.  In 2010, Bullard asked for assistance from Steven Papet, an investigative auditor with the California Department of Justice, because she knew the matter was going to be "document heavy."  In July 2011, Bullard e-mailed Papet that the DA was ready to file as soon as he finished his analysis.  However, the investigation then led to the discovery of additional victims.  In June 2012, Bullard learned that Collings and Taylor

might be victims.  Through that interview Bullard learned about Stevens and Allen and interviewed them in July 2012.  Thus, the DA was discovering additional victims six months before it filed charges against Bovensiep.

(Lodgment No. 2, <u>People v. Bovensiep</u>, No. D068198, slip op. at 11.)

Petitioner first argues that his victims should have realized he was engaged in criminal conduct prior to his admission during the December 9, 2009, meeting that he had used their money for personal purposes.  The findings of the trial and appellate courts that the delay in filing a criminal complaint was due to the time it took victims to realize Petitioner had defrauded them is objectively reasonable.  As discussed below in connection to the statute of limitations, the state court correctly found the jury could have drawn a reasonable inference from the trial testimony that Petitioner used his position as a former deputy sheriff, and as a good friend and fellow church member, to mislead the victims when they first asked him about their suspicions regarding their investments.  As discussed below, even if the delay in discovering the crimes could contribute to a Fifth Amendment due process violation, Petitioner's due process rights were not violated by the delay because the jury found he caused the delay.

Petitioner next points to the ten-month delay from the December 30, 2009 criminal complaint until the District Attorney appointed Investigator Bullard in October 2010.  Evidence presented at a post-trial motion, which included Bullard's testimony, established that the Sheriff's Department referred the case to the District Attorney in April 2010, and Bullard was assigned the case in October 2010.  (RT 3026-36.)  When asked by the trial judge for a justification for the six-month delay in assigning the case, the prosecutor said:

> Your Honor, I have no idea.  The only thing I can do is speculate that there wasn't enough investigators or maybe everybody else was busy with other cases.  I don't have a justification.  [¶]  And I can just flat-out say it should have been assigned to someone even if somebody would have said, "I'll get to it as soon as I get to it" and not start working on it right away, at least assigned to someone.

(RT 3027.)

Although Petitioner correctly notes that the trial court found the six-month delay in assigning an investigator unjustified (RT 3062-63), that is the only unjustified delay the state court assigned to the prosecution, and delays arising from government negligence present less weighty concerns that purposeful government delay. <u>Barker</u>, 407 U.S. at 531. As to the remaining pre-accusation delay, the trial judge stated: "The timeline submitted by Ms. Bullard clearly indicates that over most of the time leading up to the charges being filed there was investigative work being done. And the cases make pretty clear if it is truly being investigated, which we want the law enforcement side to do, then that's going to be justified." (RT 3062.) The referenced timeline is in the record. (CT 603-05.)

With respect to prejudice, evidence was presented that the bank routinely destroyed its records after seven calendar years, and that the destroyed bank records consisted of cashier's checks which Petitioner argued "would have shown, we believe, that [Petitioner] was using those funds in the normal course of his real estate business." (RT 3002.) The trial court found that the six-month unjustified delay did not cause the destruction of the bank records, but found the records were "not available because the case itself is old, took a long time for the victims to realize they, in their minds, were being swindled, and took a while for the prosecution to legitimately investigate the case." (RT 3063.) The court also found that even if the bank records had not been destroyed, and even if they showed Petitioner spent the victims' money on business expenses as he claimed, they would not have exonerated him because the jury found he took the victims' money knowing he could not pay it back and with no intention of paying it back. (RT 3052.)

Petitioner argues that he was acquitted of the charges involving the Hawaii property because he had the bank records as to those charges, and would have been acquitted on the remaining charges but for the lack of records as to those counts. However, he was convicted on count 7 involving defrauding Kneeshaw on the Hawaii property, and unlike the Hawaii counts which involved real property, and which a defense expert testified at trial she could find no "red flags" in the business records normally associated with fraud or embezzlement (RT 2322-23, 2441), the other counts on which he was convicted, other

than count 1 which involved Petitioner writing checks to himself from the Hawaii condominium account, involved a nonexistent condominium (RT 1495-99, victim Miller-count 13), and personal loans by the victims to Petitioner who told them he was loaning the money to third persons who wished to purchase real estate but were unable to obtain conventional bank funding.  (See RT 171: victim Taylor-count 21; RT 368: victim Stevens-count 18; RT 403: victim Colling-count 19; RT 616: victim Osborne-count 20; RT 653: victim Allen-counts 16-17; RT 1302, 1307, 1321 and 1335: victim Keenshaw-counts 5, 8-11; RT 1484-85: victim Semeit-count 12.)  Petitioner was convicted on those charges despite the defense expert's testimony that she examined the available records with respect to the personal loans and found no evidence indicating they were used for anything other than Petitioner's business.  (RT 2328-34.)  Thus, the state court correctly found Petitioner has not established prejudice because even if the missing bank records showed the same thing as the records which were available at trial, that the money Petitioner obtained from the personal loans was used in his business, it would not have undermined the evidence that established he misled the victims regarding his intention of paying them back.  (RT 3052.)

Petitioner next contends, as he did in state court, that he can also show prejudice arising from the destruction of documents in his storage unit.  In the trial court he claimed that a complete record of correspondence between him and the members of the "Taylor Group"[1] were kept in a storage facility he leased, and they were destroyed in October 2013 because he failed to pay the fee for the storage unit, which was caused by the loss of his job as a result of his arrest on January 29, 2013.  (CT 541-44.)

To the extent Petitioner contends the prosecution would have identified the Taylor Group victims sooner had the correspondence been retrieved from storage, the trial judge

---

[1]  Referring to Taylor (the victim in count 21), who referred two of her sisters, Laura Colling (count 19) and Marsha Allen (counts 16-17), and her friend Diane Mullins to Petitioner. Allen in turn referred her friend Patricia Osborne (count 20) to Petitioner, and Mullins referred Stevens (count 18), her father, to Petitioner.  (RT 197, 367, 403, 614-15.)

17cv0074-GPC (NLS)

found that Petitioner could have recovered the documents from storage but chose not to, and did not tell the prosecution about the records which would have allowed them to be subpoenaed and preserved. (RT 3005-10, 3024.) Petitioner admitted in the post-trial motion that he went to his storage unit and retrieved documents relating to the Hawaii counts and could have but did not take the remaining records, which he contended showed he had made some payments to the victims on their loans and could have been used at trial to show that he intended to pay them back. (RT 3009.) The state court correctly found Petitioner has not shown that the destroyed correspondence would have added anything to, or contradicted the testimony of, the victims from the Taylor Group who testified at trial that he made initial interest payments on several of the loans (RT 374, 406-11, 426, 428, 624, 655-60), but when the payments stopped and they attempted to contact him by phone, letter and e-mail, they were often unable to do so (RT 186, 375, 417-18, 432-37, 441-46, 625-26, 662), and when they were able to contact him he misled them to believe their investments were safe and told them they should "hang in there a little longer." (RT 227, 256, 375-77, 446-47, 661-62, 672-73.) Thus, it was objectively reasonable for the state appellate court to find that the destruction of the records from the storage unit in September 2013, about eight months after Petitioner was charged and arrested, was entirely Petitioner's fault, and even if they consisted of correspondence to the victims regarding promises of repayment, it would have been cumulative to, and not have rebutted the testimony of, the victims that he misled them in that respect.

The Court finds that because Petitioner has failed to carry his "heavy burden" of identifying non-speculative prejudice arising from the destruction of the bank records or the storage unit documents due to pre-charging delay, Lovasco, 431 U.S. at 790, the state court finding to that effect is not based on an unreasonable determination of the facts, and is not contrary to, or an unreasonable application of, clearly established federal law.

Finally, Petitioner contends the pre-charging delay violated his federal constitutional right to due process because it violated the state statute of limitations. The last reasoned state court opinion as to this claim is the appellate court opinion on direct appeal.

The state appellate court denied this aspect of claim one, stating:

A. Additional Background

Before trial, the court denied Bovensiep's motion to dismiss some of the charges on statute of limitations grounds. The court explained that Bovensiep's position of trust and reasonable excuses allowed him to get away with his crimes longer as the victims believed Bovensiep's assurances that he would pay them back. The trial court held that the position of trust that Bovensiep had with the victims created a triable issue of fact for the jury.

The parties agreed that each of the grand theft and securities fraud counts were subject to a four-year statute of limitations, which accrued upon discovery, and that the prosecution of the action began on February 13, 2013, when the original information was filed. The parties argued the statute of limitations issue to the jury. The trial court instructed the jury that the People began the prosecution of the case on February 13, 2013, and for the prosecution to be timely the jury needed to find that the People prosecuted the crimes within four years of the date the victims discovered or should have discovered Bovensiep's criminal actions.

Thus, to be timely, the jury needed to find that the events giving rise to the vast majority of the counts could not have been legally discovered before February 13, 2009, four years prior to the filing of the original information. In finding Bovensiep guilty, the jury necessarily concluded that the statute of limitations did not bar the 10 counts at issue.

B. Legal Principles

A defendant may raise a statute of limitations claim in a pretrial motion, but the trial court may decide the issue as a matter of law only if the facts are undisputed. (*People v. Le* (2000) 82 Cal.App.4th 1352, 1361.) A pretrial motion to dismiss on the ground the statute of limitations has run "is the functional equivalent of a motion for summary judgment in the civil context." (*People v. Lopez* (1997) 52 Cal.App.4th 233, 251 (*Lopez*).) The court should grant the motion only if the evidence establishes as a matter of law that the statute has run. (*Id.* at p. 250.) If the People prevail on the motion, then the jury must resolve the limitation issue if it remains disputed by the defendant. (*People v. Zamora* (1976) 18 Cal.3d 538, 563–564, fn. 25 (*Zamora*).)

"(T)he statute of limitations is not an ingredient of an offense but a substantive matter for which the prosecution's burden of proof is a preponderance of the evidence." (*People v. Riskin* (2006) 143 Cal.App.4th 234, 241.) "Under the preponderance of evidence standard, the prosecution is entitled to prevail at trial even if the evidence is conflicting (and thus does

not establish the point as a matter of law) if the fact finder believes the prosecution's evidence and that finding is supported by substantial evidence." (*Lopez*, *supra*, 52 Cal.App.4th at p. 250.)  Under the substantial evidence standard, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  We resolve all evidentiary and credibility conflicts in favor of the verdict and indulge every reasonable inference the jury could draw from the evidence.  (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.)

A four-year statute of limitations applies to grand theft and securities fraud.  (Pen. Code, §§ 801.5, 803, subd. (c)(1) & (3).)  The limitations period "does not commence to run until the discovery of an offense. . . ."  (Pen. Code, § 803, subd. (c).)  "The crucial determination is whether law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud."  (*Zamora*, *supra*, 18 Cal.3d at pp. 571–572, italics omitted.)  "(I)t is the discovery of the crime, and not just a loss, that triggers the running of the statute."  (*Lopez*, *supra*, 52 Cal.App.4th at p. 246, fn. 4.)  The inquiry as to the discovery of the offense is a question of fact for the jury to decide.  (*Zamora*, *supra*, at p. 565.)  On appeal, a jury's findings on the discovery issue are tested under the substantial evidence standard.  (*Ibid.*)  Where a defendant occupies a position of trust "'facts which would ordinarily require investigation may not excite suspicion.'"  (*People v. Crossman* (1989) 210 Cal.App.3d 476, 482.)

C.  Analysis

Bovensiep contends his conviction on two securities fraud charges involving the Kneeshaws and eight grand theft counts involving Dixon, the Kneeshaws, Semeit, Miller and Stevens must be reversed because the four-year limitations period expired before the prosecution commenced for these offenses.  The jury disagreed that the limitations period had expired, impliedly finding these individuals did not know they were victims of a crime before February 13, 2009.  As we shall explain, substantial evidence supported this implied finding as to each victim.

As a preliminary matter, Bovensiep asserts each of the above victims should have known that a crime had potentially occurred before February 13, 2009, based on the bounced checks, property foreclosures and his failure to respond to their inquiries.  Bovensiep asserts that had the victims investigated, they would have discovered additional facts requiring further inquiry.  Even assuming, however, that each victim had done some investigation, the

testimony of Bovensiep's own expert suggested such an investigation would not have led the victims to believe a crime had been committed.

Janet McHard, a certified fraud examiner for the defense, reconstructed the accounting records for Bovensiep's companies for five different bank accounts, entering every transaction into an accounting program. McHard described this as a tedious process that took at least two months. McHard ultimately formed the opinion that there were no signs of fraud. Specifically, she found no evidence of deception or misrepresentation of facts in contemporaneous documents and no false or altered documents. While McHard agreed with the prosecution's definition of a Ponzi scheme, she did not find such a scheme in this case. McHard found evidence of a "procurement violation," meaning money was taken from accounts without permission. While McHard admitted this could be fraud, she stated it could also be improper training or forgetfulness. McHard admitted there were "frequent" bounced checks, but stated that a bounced check "in and of itself, is not a hallmark of fraud." She also stated that losing property to foreclosure is not a red flag for fraud.

Accordingly, there was sufficient evidence for the jury to reject Bovensiep's argument that the exercise of reasonable diligence would have led each victim to discover his crimes before February 13, 2009.

**Ronald Dixon—Count 1**

Dixon and Bovensiep became friends and started a business relationship, with Bovensiep helping Dixon sell two parcels of property. Dixon was "extremely satisfied" with Bovensiep's services. Dixon had a high impression of Bovensiep because Bovensiep associated with people who Dixon thought of highly. Dixon trusted Bovensiep as he knew Bovensiep was a past peace officer who attended church and had real estate knowledge.

In late 2004 or 2005, Bovensiep mentioned a Hawaii condominium investment opportunity to Dixon. Dixon decided to invest after meeting Craig Knudsen, Bovensiep's pastor. Dixon felt comfortable joining a partnership with Knudsen and Bovensiep as they were both Christians, he was a Christian and they appeared very honest and reliable.

Dixon purchased an interest in the 835 property for a total of $117,578 in June 2005. Dixon knew that the operating agreement for the condominium limited Bovensiep, as the managing partner, to not exceed $1500 in expenses without approval of all three partners. When Dixon purchased his interest, the 835 property had about $81,000 in assets.

In late 2005, Dixon received some documents showing the LLC had only about $500 or $600 in cash. This concerned Dixon. Dixon sent some e-mails to Bovensiep about the issue but never got a response. Dixon believed that Bovensiep had "some explaining to do" regarding depletion of the cash account. When Dixon never got a response from Bovensiep, he contacted Daniel Tobias, the accountant for the LLC, and asked where the money had gone. Tobias referred Dixon back to Bovensiep, telling Dixon that he just reports what he is given. When Bovensiep did not respond, Dixon went back to Tobias.

Tobias told Dixon that there had been a "loan to buyers" that added up to around $65,000. Dixon was "shocked" because Bovensiep was limited to $1,500 for expenditures and there had been no approval from the other partners for this loan. Dixon did not understand what the term "loans to buyers" meant because he was unaware of the LLC loaning money to anybody. Dixon was "concerned" when he learned about the loan because he was unaware of any buyers and had not authorized the expenditure. Dixon asked Bovensiep for an explanation, but never received one.

On December 9, 2008, Dixon e-mailed a list of 15 questions to Bovensiep after reviewing the financial statements for the 835 property from May 2005 to December 2007. The first question asked Bovensiep for an explanation regarding the depleted cash assets. In another question, Dixon asked about a write-off for a bad debt, wanting to know about the debt, stating "This smells of embezzlement and I demand a full disclosure."

Bovensiep e-mailed a response on December 17, 2008, but Dixon could not recall if Bovensiep had completely answered his questions. Bovensiep ended the e-mail with "good news" including that rates were dropping and this would enable him to refinance a bunch of loans. Dixon e-mailed a response to Bovensiep's answer that same day, thanking Bovensiep for the update. When asked whether Bovensiep had done a good job in keeping Dixon informed up to this point, Dixon responded "Not totally." Around December 21, 2008, Dixon was "(a) little frustrated" with Bovensiep because Bovensiep had not provided full explanations.

This evidence shows that Dixon knew, and was concerned about, the depleted cash reserves for the 835 property since late 2005. Dixon also knew that the unauthorized "loans to buyers" violated a provision in the operating agreement. The jury, however, could have reasonably concluded that Dixon did not have sufficient information that would have led him to discover that Bovensiep had committed a crime. Bovensiep's lack of responsiveness to Dixon's inquires, while frustrating, did not evidence a crime particularly when

17cv0074-GPC (NLS)

viewed in conjunction with Dixon's generally high impression of Bovensiep and his belief that Bovensiep was honest and reliable.

It was not until Thanksgiving Day 2009, that Dixon was shocked to learn that the 835 property was being foreclosed. On December 2, 2009, Dixon and others met with Bovensiep at a Coco's restaurant. The participants recorded the meeting and the jury listened to the recording. The general tone of the meeting was cordial and not accusatory, with Bovensiep expressing his gratitude on how congenial and gracious everyone had been.

During the meeting, Bovensiep stated they were together to "fix" things, that the past two years have been devastating and he was receiving counseling. Dixon indicated that he did not think Bovensiep was a bad person, that Bovensiep had good intentions and everyone was trying to work with Bovensiep because Dixon knew the current situation in the real estate market. Dixon again expressed his trust in Bovensiep telling him: "We had, we had some serious doubts, and again my paranoia goes when you don't talk to me. I've told you a thousand times, but if you talk to us, we could take that as good news." The meeting closed with Bovensiep telling everyone that he had his "list" and would "get back to you guys" with more information.

Thus, even at this late date, Bovensiep promised to provide more information to ease Dixon's concerns. Dixon believed Bovensiep had "good intentions" and was most concerned about Bovensiep's lack of communication. On these facts, the jury could reasonably conclude that Dixon did not have sufficient information of criminal activity until Dixon was served with a lawsuit regarding the 835 property in February 2009.

**The Kneeshaws—Counts 5, 7–11**

The Kneeshaws were longtime friends of Bovensiep. They knew him as a "great family man" and "church man" who had helped them and their son with their respective homes. Terry had an "overwhelming" amount of trust in Bovensiep. In 2007, the Kneeshaws invested in the Kihei property and entered into three separate loan investments with Bovensiep, supposedly to people in need. When Terry inquired about missed interest payments, Bovensiep told her that the people who had her money were having difficulties, but that her money was safe and she should not worry. Bovensiep preyed on Terry's sympathies, telling her children were in danger of losing their homes or meals.

In 2008, the Kneeshaws made a fourth loan investment that had a due date in July 2011. Although Terry was hesitant to make the last loan because the earlier loans had not been repaid, she still trusted Bovensiep and did not want other people to lose their homes. During this time period, the Kneeshaws

received monthly interest payments from Bovensiep on the first loan for about one year.

On December 5, 2009, George learned that the Kihei property was facing foreclosure. George met with the other investors two times, a couple of weeks apart, to discuss the situation and attempt to gather documents about what was owed on the property. The investors realized they had no standing to talk to the bank or the homeowner's association because the Kihei property was not in their names. At the end of December 2009, George reported the matter to the sheriff's department for a potential criminal investigation. Until the day he learned about the foreclosure, George still trusted Bovensiep, never believed Bovensiep would steal from him and believed Bovensiep's reassurances about repayment of the notes.

The jury could have reasonably concluded that the Kneeshaws did not have sufficient information that Bovensiep had committed a crime until the sheriff's office referred the matter to the DA in February 2010.

### Frederick Semeit—Count 12

Semeit received two notes from Bovensiep with maturity dates in November and October 2008, with the belief that he would be paid interest and would receive his principal back when the notes matured. Bovensiep claims that Semiet's receipt of only one interest payment put him on inquiry notice and with further inquiry he would have discovered that he was the victim of a crime.

This argument ignores Semiet's trust in Bovensiep and Bovensiep's constant reassurances that he simply needed more time to get Semiet's money back. Semiet last spoke to Bovensiep for the purpose of inquiring about repayment in 2009, when Bovensiep again told Semiet "Don't worry. I'll pay you back." While the evidence shows Bovensiep failed to repay Semiet, it does not show that Semiet suspected Bovensiep of a crime. Nor does the evidence suggest what further inquiry Semiet could have undertaken to discover Bovensiep's crime after Bovensiep failed to pay on the notes.

### Chris Miller—Count 13

In April 2008, Miller gave Bovensiep $48,000 to purchase a condominium. Around April 2009, Miller told Bovensiep that he wanted out of the investment as he had yet to receive any paperwork. Bovensiep promised to return Miller's money as soon as Bovensiep got another investor. After 60 days went by, Miller asked Bovensiep for a promissory note, which Bovensiep provided in April 2009, which stated payment was due in 60 days. Bovensiep later replaced that promissory note in June 2009, with another note

due in 60 days. In November 2009, Miller knew Bovensiep was lying to him, but after speaking to Bovensiep's wife he "absolutely" believed he would get his money back.

Although Miller testified that Bovensiep had deceived him about the investment from April 2008 to April 2009, Bovensiep promised to return Miller's money and gave Miller two promissory notes. Miller believed that Bovensiep would repay him. A reasonable jury could have concluded that Miller did not discover Bovensiep's theft until Bovensiep failed to pay on the June 2009 promissory note in August 2009. Thus, Miller did not realize he was the victim of a crime until after February 13, 2009.

**Robert Stevens—Count 18**

In January 2007, Stevens invested $25,000 with Bovensiep. Stevens knew that Taylor had been doing business with Bovensiep for quite a while and believed Bovensiep to be a good honest person. Stevens received about four monthly interest payments, but then the checks started to bounce. Bovensiep blamed the problem on someone else and told Stevens he would take care of the issue. Bovensiep then stopped sending Stevens any checks. Stevens sent Bovensiep a couple of letters, but got no response. Bovensiep eventually told Stevens that he would repay him from a business deal in Brazil that would be paying Bovensiep a lot of money. Stevens talked to Bovensiep again, who said he was still working on the Brazil deal. Bovensiep also told Stevens that he would repay Stevens when the economy improved.

On July 21, 2009, Mullins helped Stevens write Bovensiep a letter, which Stevens signed. In March 2010, Stevens agreed to Bovensiep extending the note for another year. In May 2010, Bovensiep reassured Mullins that the note would stay in effect until he repaid Stevens. Mullins helped Stevens with a second letter in July 2010. In August 2010, Bovensiep again promised to take care of Stevens, but was unclear about the timing.

Bovensiep claims Stevens should have discovered the theft in 2008 when the checks Stevens received bounced. A reasonable jury, however, could have concluded that based on Bovensiep's promises to repay Stevens from the Brazil deal, that Stevens had no reason to suspect Bovensiep until July 2009, when Mullins and Stevens sent their first letter to Bovensiep. Thus, the jury reasonably concluded that Stevens could not have discovered the theft before February 13, 2009. [¶] Accordingly, substantial evidence supported the jury's implied finding that the statute of limitations had not expired for the challenged counts.

(Lodgment No. 2, <u>People v. Bovensiep</u>, No. D068198, slip op. at 12-23.)

17cv0074-GPC (NLS)

A state court's interpretation of a state statute of limitations binds a federal court sitting in habeas. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions.") Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") This Court must defer to the state court's construction of state law unless it is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989). Nevertheless, "[t]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.")

The United States Supreme Court, in determining that the Fifth Amendment rather than the Sixth Amendment is applicable to pre-charging delay, stated:

> The law has provided other mechanisms to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge. As we have said, the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges. Such statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defense. These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced. [¶] The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment

17cv0074-GPC (NLS)

because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.

Marion, 404 U.S. at 322-23 (internal quotation marks and citations omitted).

Petitioner has identified no "clearly established federal law" which prohibits conviction on criminal charges merely because they were brought past a state statute of limitations, as opposed to the general Fifth Amendment due process protection from prejudicial pre-trial delay. See Loeblein v. Dormire, 229 F.3d 724, 726 (8th Cir. 2000) ("[A] state court's failure properly to apply a state statute of limitations does not violate due process or, indeed, any other provision of the Constitution or a federal statute.") However, § 2254(d)(1) does not require an "identical factual pattern before a legal rule must be applied." White v. Woodall, 572 U.S. 415, 427 (2014), quoting Panetti v. Quarterman, 551 U.S. 930, 953 (2007). "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Id., quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). Even if clearly established federal law protected Petitioner from conviction on criminal charges brought after expiration of the state statute of limitations, or if that is a factor encompassed by the Fifth Amendment due process analysis, for the following reasons he has not shown that the state court erred in any respect, or that it's decision is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." Oxborrow, 877 F.2d at 1399.

Petitioner argued prior to trial, at trial, and on appeal, as he does here, that the statute of limitations started to run when his victims began to notice irregularities in their investments which should have made them suspicious of fraud. The trial judge denied a pre-trial motion to dismiss for violation of the statute of limitations, but permitted the jury to determine when Petitioner's criminal conduct was first discovered, stating:

> But the thing that – a couple of things that stand out to me that make this, in my view, a triable issue is: one, all of this is happening in context of a collapse of the economy. You know, you have people losing money left and

17cv0074-GPC (NLS)

right on real estate, investments, people not being able to make their payments. One or both of you allude to this financial situation in your papers, and it was discussed at the 995 to some degree too, that's one thing.

And then the other is what seems to me to be a position of trust or close relationship with the Dixons and the Kershaws (sic) through this church relationship. You know, one of the – one of the reasons we treat people who are in a position of trust to then violate that trust by stealing is that: one, it's just immoral; and two, it makes it easier. You have access and the ability to get away with it, at least for a longer time, because people do trust you.

And one of the reasons that they – well, because they trust you, they don't think in terms of – they may not think in terms of criminal activity as soon as someone who would that doesn't know you.

[The prosecutor] made reference to just some broker and all of a sudden he's not getting back to you or your investment just disappears or your property is foreclosed on, you're not notified, you probably would – most people would probably respond more quickly and recognize the problem may be criminal sooner than you would have when you have some guy who you think is this great guy at your church or with the Kershaws, probably not saying that name right, with them I think they had – their daughter had a successful financial relationship with the defendant I think, maybe some loan or something if I recall correctly, so they have a reason not to think he's committing a crime, but maybe it's just a screw-up in the context of this bad economy.

So I just can't find that it's not a triable issue. I will say that it's going to be, I think, a difficult issue at trial because of all these things that make it a triable issue. It's going to probably be a bigger part of the trial than it should be in this kind of case, you know. But I think it will be a triable issue. [¶] But I can't find that, as a matter of law, that discovery was made at an earlier time than alleged, so I'm going to deny the motion to dismiss.

(RT 16-17.) The jury was instructed:

The defendant may not be convicted of counts 1 through 13, and 16 through 21, unless the prosecution began within four years of the date the crimes were discovered or should have been discovered. [¶] The prosecution of the charges set forth in counts 1 through 13, and 16 through 21, began on February 13th of 2013; the prosecution of count 21 (involving alleged victim Karen Taylor), prosecution of which began on December 29th, 2013.

> A crime should have been discovered when the victim was aware of facts that would have alerted a reasonably diligent person in the same circumstances to the fact that a crime may have been committed. . . . The statute of limitations is not an issue in counts 14 and 15, and counts 22 through 27, so this instruction does not apply to those counts.[2]

(RT 2777-78.)

As quoted above, the appellate court found substantial evidence supported the implied finding by the jury that the charges were brought within the four-year statute of limitations. The state court finding that the victims would have had no reason to investigate is particularly reasonable in light of the trial testimony of a defense expert who saw no "red flags" of fraud or embezzlement in the bank records. (RT 2322-44.) Petitioner has identified no error in the state court's finding regarding the statute of limitations, and has not supported his claim that his prosecution was fundamentally unfair as a result of this aspect of the pre-charging delay.

In sum, the Court finds that the state court adjudication of claim one is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. In addition, even if Petitioner could satisfy that standard, he has not alleged facts which, if true, demonstrate a violation of his federal constitutional rights. Accordingly, the Court recommends denying habeas relief as to claim one.

## C.    Claim Two (Post-Charging Delay)

Petitioner alleges in claim two that he was denied his Fifth, Sixth and Fourteenth Amendment rights to due process, fundamental fairness and a speedy trial by the destruction of exculpatory evidence caused by "'unjustified' and 'negligent' delays in an already 'old case'" by the prosecution after charges were filed. (ECF No. 10 at 7; ECF No. 10-1 at 1-6.) Respondent answers that the state court denial of this claim, on the basis

---

[2] Petitioner was found guilty on counts 1, 5, 7-13, 16-21, and not guilty on counts 2-4, 6, 14-15, 22-27. (CT 832-38.)

17cv0074-GPC (NLS)

Petitioner waived his speedy trial right and requested numerous delays, is consistent with clearly established federal law providing that Sixth Amendment speedy trial guarantee is not violated when a defendant is responsible for the delays. (Ans. Mem. at 13-17.)

Petitioner presented this claim to the state supreme court in a petition for review. (Lodgment No. 3.) The petition was denied with an order which stated: "The petition for review is denied." (Lodgment No. 4.) It was also presented to the appellate court on direct appeal and denied on the merits. (Lodgment Nos. 1-2.)

The Court will look through the silent denial by the state supreme court to the appellate court opinion, which states:

> Bovensiep complains about prosecutorial delay in charging him. Delay in charging a defendant after commission of an alleged crime (pre-charging delay) does not implicate speedy trial rights. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).) The federal right to a speedy trial attaches only after an arrest or the filing of an indictment or information, although California extends the right by holding that it attaches after a complaint has been filed. (*United States v. Marion* (1971) 404 U.S. 307, 320; *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1327.)
>
> Here, Bovensiep sought to dismiss the charges against him based on alleged delays in charging him. Bovensiep never sought a dismissal based on post-charging delay. Notably, the record shows that after charges were filed, Bovensiep requested numerous continuances of the preliminary hearing and three trial continuances. Under these facts, Bovensiep waived his right to a speedy trial. (*People v. Wilson* (1963) 60 Cal.2d 139, 146 (the constitutional or statutory right to a speedy trial may be waived if not asserted prior to commencement of trial).)

(Lodgment No. 2, <u>People v. Bovensiep</u>, No. D068198, slip op. at 5.)

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. Clearly established federal law provides that the Sixth Amendment speedy trial right "is fundamental and is imposed by the Due Process Clause of the Fourteenth Amendment on the States." <u>Barker v. Wingo</u>, 407 U.S. 514, 515 (1972) (internal quote mark omitted). There are four factors in determining whether a speedy trial violation has occurred: (1) the length of delay, (2)

the reason for the delay, (3) the assertion of the right, and (4) prejudice to defendant.  Id. at 529; see also Doggett v. United States, 505 U.S. 647, 651 (1992) (listing Barker factors as: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result.")

With respect to the first Barker factor, the length of the delay between the filing of the initial charging document in February 2013 (CT 1), and the beginning of jury voir dire in February 2015 (CT 781), a period of two years, is considerable.  See United States v. Lam, 251 F.3d 852, 856 (9th Cir. 2001) (noting the general consensus among circuit courts is that eight months constitutes a threshold minimum delay triggering a speedy trial right).  However, as will be seen, the first Barker factor is mitigated by the second and third Barker factors, because the state court correctly found Petitioner never invoked his speedy trial right and requested numerous continuances.

Petitioner was arraigned on February 15, 2013, released on bond within the next ten days, and remained free of custody on bond until the verdicts were returned.  (CT 736, 738, 838.)  He waived his statutory time for a preliminary hearing four times, on February 27, May 1, August 22, and September 18, 2013, and a preliminary hearing was held on December 9-12, 2013.  (CT 740, 742, 746, 750-61.)  He waived his statutory time for trial at the end of the preliminary hearing, and a trial date was set for May 22, 2014.  (CT 759.)  On March 7, 2014, Petitioner again waived statutory time for trial, and trial was re-set for August 11, 2014.  (CT 765.)  His motion to continue the trial was granted on August 4, 2014, and a new trial date was set for August 18, 2014.  (CT 767.)  His motion to dismiss based on the statute of limitations was heard and denied on August 18, 2014, and a readiness conference was held on August 20, at which a status conference was set for October 31, 2014, and trial call set for December 2, 2014.  (RT 1-17; CT 768-69.)  At the October 31, 2014 status conference, Petitioner again waived his statutory time for trial and trial was re-set for February 3, 2015.  (CT 770.)  The parties reported for jury trial on February 3, and voir dire of prospective jurors began on February 10.  (CT 772-81.)

17cv0074-GPC (NLS)

Accordingly, although the first <u>Barker</u> factor, the length of the delay, about two years from accusatory pleading to the beginning of trial, is considerable, it is mitigated by the second and third <u>Barker</u> factors, the reason for the delay and whether Petitioner asserted his speedy trial right. The record shows Petitioner waived his statutory time for a preliminary hearing four times, waived his statutory speedy trial right on three occasions, and moved to continue the trial date on one additional occasion. The only unexplained gap is the period from August 20 to October 31, about two months, which apparently followed an August 20 unreported settlement conference. (RT 18-19; CT 769.) That two-month delay is below the threshold for denial of a speedy trial right. <u>See</u> <u>Lam</u>, 251 F.3d at 856 (noting the general consensus among circuit courts is that eight months constitutes a threshold minimum delay triggering a speedy trial right). Thus, the <u>Barker</u> delay factors weigh against finding a speedy trial violation.

With respect to the fourth <u>Barker</u> factor, prejudice, as discussed above in claim one, Petitioner did not show prejudice resulting from any delays. However, "unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the (accused's) defense will be impaired by dimming memories and loss of exculpatory evidence." <u>Doggett</u>, 505 U.S. at 654. The Supreme Court in <u>Doggett</u> noted:

> <u>Barker</u> explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown. And though time can tilt the case against either side, one cannot generally be sure which of them it has prejudiced more severely. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other <u>Barker</u> criteria, it is part of the mix of relevant facts.

<u>Id.</u> at 655 (internal quote marks and citations omitted).

Petitioner has not shown excessive delay in bringing his case to trial after the filing of the first charging document. He requested seven of the delays, and only about two

17cv0074-GPC (NLS)

months of the two-year delay is not, on the record before this Court, conclusively attributable to him. Without a showing of post-charging excessive delay, there is no presumption of prejudice. Id. Because Petitioner has not shown prejudice or an excessive delay not attributable to him, he has failed to demonstrate a violation of his Sixth Amendment right to a speedy trial. Accordingly, the Court finds the state court adjudication of this claim, on the basis that Petitioner waived his right to a speedy trial by not invoking it and requesting the delays, is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. Even if he could satisfy that standard, he has not alleged facts which, if true, show a violation of his federal constitutional rights. Accordingly, the Court recommends denial of habeas relief as to claim two.

## V.    **CONCLUSION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **November 9, 2018**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **November 30, 2018.** The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

Dated:  October 24, 2018

_____
Hon. Nita L. Stormes
United States Magistrate Judge